## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | |
|---|---|
| DALE TOMPKINS, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Civil Action No.  3:18-cv-86-DJH |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| v. | |
| KINDRED HEALTHCARE, INC., BENJAMIN A. BREIER, JOEL ACKERMAN, JONATHAN D. BLUM, PAUL J. DIAZ, HEYWARD R. DONIGAN, RICHARD GOODMAN, CHRISTOPHER T. HJELM, FREDERICK J. KLEISNER, SHARAD MANSUKANI, LYNN SIMON, PHYLLIS R. YALE, KENTUCKY HOSPITAL HOLDINGS, LLC, KENTUCKY HOMECARE HOLDINGS, INC., KENTUCKY HOMECARE MERGER SUB, INC., TPG GLOBAL, LLC, WELSH, CARSON, ANDERSON & STOWE and HUMANA INC., | **JURY TRIAL DEMAND** |
| Defendants, | |

## CLASS ACTION COMPLAINT

Plaintiff Dale Tompkins ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.     Plaintiff brings this class action on behalf of the public stockholders of Kindred Healthcare, Inc. ("Kindred" or the "Company") against Kindred's Board of Directors (the "Board"

1

or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15.U.S.C. §§ 78n(a), 78t(a),  and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, arising out of the Board's attempt to sell the Company to TPG Global, LLC, Welsh, Carson, Anderson & Stowe, and Humana Inc. through TPG Global, LLC's affiliates Kentucky Hospital Holdings, LLC, Kentucky Homecare Holdings, Inc. and Kentucky Homecare Merger Sub, Inc. (collectively the "Consortium").

2.     Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading preliminary proxy statement (the "Proxy") to be filed with the Securities and Exchange Commission ("SEC") on February 5, 2018.  The Proxy recommends that Kindred shareholders vote in favor of a proposed transaction (the "Proposed Transaction") whereby Kindred is acquired by the Consortium. The Proposed Transaction was first disclosed on December 19, 2017, when Kindred and the Consortium announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which Kentucky Homecare Holdings, Inc. will acquire all of the outstanding shares of common stock of Kindred for $9.00 per share in cash (the "Merger Consideration"). After the Proposed Transaction closes, Kindred's home health, hospice and community care businesses will be separated from the rest of the Company and acquired by Kentucky Hospital Holdings, LLC. The deal is valued at approximately $4.1 billion and is expected to close in the summer of 2018.

3.     The Board agreed to sell the Company right at the point where Kindred was beginning to come out of a rocky period after a large acquisition, a repositioning plan and political uncertainty. Just as the Company was beginning to see positive results from its repositioning plan, and at a time when the stock price was deflated, the Board sold to the Consortium for a price that was less than other offers. Indeed, a large Kindred stockholder has expressed its belief that the

Proposed Transaction is not in the stockholders' best interests and does not maximize stockholder value.

4.      Furthermore, the Proxy is materially incomplete and contains misleading representations and information in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy contains materially incomplete and misleading information concerning the sales process, financial projections prepared by Kindred management, as well as the financial analyses conducted by Barclays Capital Inc. ("Barclays") and Guggenheim Securities, LLC ("Guggenheim"), Kindred's financial advisors.

5.      For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, including filing a definitive proxy statement ("Definitive Proxy") with the SEC or otherwise causing a Definitive Proxy to be disseminated to Kindred's shareholders, unless and until the material information discussed below is included in the Definitive Proxy or otherwise disseminated to Kindred's shareholders. In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations.

**PARTIES**

6.      Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Kindred.

7.      Defendant Kindred is a corporation organized and existing under the laws of the State of Delaware.  The Company's principal executive offices are located at 680 South Fourth Street, Louisville, Kentucky 40202. Kindred common stock trades on NYSE under the ticker symbol "KND." Kindred is the largest home healthcare provider in the United States.

8.  Defendant Benjamin A. Breier has been President of the Company since May 2012 and CEO and a director of the Company since March 2015. Breier is not considered an independent director, as defined under the NYSE's listing standards, according to the Schedule 14A Proxy Statement filed with the SEC on April 4, 2017.

9.  Defendant Joel Ackerman has been a director of the Company since 2008.

10.  Defendant Jonathan D. Blum has been a director of the Company since 2008.

11.  Defendant Paul J. Diaz has been a director of the Company since 2002. Diaz previously served as President of the Company from 2002 to May 2012, CEO from 2004 to March 2015 and as Executive Vice Chairman from March 2015 to March 2016. Diaz is not considered an independent director, as defined under the NYSE's listing standards, according to the Schedule 14A Proxy Statement filed with the SEC on April 4, 2017.

12.  Defendant Heyward R. Donigan has been a director of the Company since 2014.

13.  Defendant Richard Goodman has been a director of the Company since 2014.

14.  Defendant Christopher T. Hjelm has been a director of the Company since 2011.

15.  Defendant Frederick J. Kleisner has been a director of the Company since 2009.

16.  Defendant Sharad Mansukani has been a director of the Company since 2015.

17.  Defendant Lynn Simon has been a director of the Company since November 2016.

18.  Defendant Phyllis R. Yale has served as Chair of the Board since May 2014 and has been a director of the Company since 2010.

19.  Defendants Breier, Ackerman, Blum, Diaz, Donigan, Goodman, Hjelm, Kleisner, Mansukani, Simon and Yale are collectively referred to herein as the "Board."

20.  Defendant Kentucky Hospital Holdings, LLC ("Hospital Parent") is a Delaware limited liability company and was formed by affiliates of TPG Global, LLC.

21.    Defendant Kentucky Homecare Holdings, Inc. ("Parent") is a Delaware corporation and was formed by affiliates of TPG Global, LLC.

22.    Defendant Kentucky Homecare Merger Sub, Inc. ("Merger Sub") is a Delaware corporation and a wholly owned subsidiary of Kentucky Homecare Holdings, Inc.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

24.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

25.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Kindred maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## CLASS ACTION ALLEGATIONS

26.    Plaintiff brings this action on his own behalf and as a class action on behalf of all owners of Kindred common stock and their successors in interest and/or their transferees, except

Defendants and any person, firm, trust, corporation or other entity related to or affiliated with the Defendants (the "Class").

27.    This action is properly maintainable as a class action for the following reasons:

(a)    The Class is so numerous that joinder of all members is impracticable.  As of December 18, 2017, Kindred had approximately 91.4 million shares outstanding and not held by the Company in its treasury.

(b)    Questions of law and fact are common to the Class, including, inter alia, the following:

(i)    Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(ii)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

(iii)    Whether Plaintiff and other members of the Class would suffer irreparable injury were Defendants to file a Definitive Proxy with the SEC that does not contain the material information referenced above and the Proposed Transaction is consummated as presently anticipated;

(iv)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transaction complained of herein consummated; and

(v)    whether the Class is entitled to injunctive relief or damages as a result of Individual Defendants' wrongful conduct.

(c)    Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)    Plaintiff's claims are typical of those of the other members of the Class.

(e)    Plaintiff has no interests that are adverse to the Class.

(f)    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)    Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)    Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.  The Proposed Transaction is Ill-Timed and Undervalues the Company

28.    Kindred is a national healthcare company that operates in three segments: hospitals; rehabilitation services; and at-home services. Kindred had operated nursing centers and assisted living facilities until June 2017, when it sold its nursing facility segment for $700 million.

29.    In late 2014, Gentiva Health Services, a national at-home healthcare company, agreed to a sale to Kindred for $1.8 billion after Kindred attempted a hostile takeover earlier in 2014. In November 2014, Kindred agreed to acquire Centerre Healthcare Corp., an inpatient rehabilitation company, for $195 million. The acquisitions, which closed in 2015, were part of a "repositioning plan" that Kindred began in 2013, intended to focus more on home health and

rehabilitation services, and less on skilled nursing.

30.     Over the next two years, Kindred experienced some growing pains with its "repositioning plan." Financial results were in-line with analyst expectations until August 2015, when revenues missed by $20 million. In November 2015, Kindred missed EPS estimates by $0.02 and missed revenue estimates by $60 million. Kindred's financial results fluctuated over the next year, volleying between missing and beating analyst estimates.

31.     In 2017, political uncertainty roiled the healthcare industry. In July 2017, the Centers for Medicare and Medicaid Services released its proposed payments rule for home health services, stating that it intended to reduce Medicare payments. It was not until November 2017 that the Centers for Medicare and Medicaid Services announced that it would not finalize the proposed payments rule. That same month, Congress worked on a tax bill that would limit the deduction for net interest expense, cap the use of net operating losses and eliminate the ability to carryback net operating losses. The tax bill passed in December 2017.

32.     The impact of the repositioning plan and political uncertainty was felt most in the Company's stock price. Between January 1, 2015 and December 1, 2017, Kindred's stock price fell 69%.

33.     Despite the challenges facing Kindred, analysts and investors believed the Company would see long-term growth. A November 5, 2015 article on The Motley Fool entitled "Why Kindred Healthcare Shares are Getting Crushed" noted that the Company was facing challenges, but stated: "If Kindred can indeed use its acquisitions to reduce its expenses and boost cash flow, then it's not out of the question that it could generate $2 in EPS for the full-year by as

soon as 2018 to 2020."[1]

34.     Optimism in Kindred's outlook was expressed in a February 28, 2017 The Motley Fool article entitled "Why Kindred Healthcare, Inc. Jumped Higher Today." The article noted that things were looking up, and stated that "[l]ong-term investors willing to wait for the turnaround could end up being handsomely rewarded if management can hit its targets."[2]

35.     While Kindred's long-term growth prospects were extolled by analysts, the Board decided to sell the Company to the Consortium. On December 19, 2017, the Board entered into the Merger Agreement with Hospital Parent, Parent and Merger Sub.

36.     A large Kindred stockholder, Brigade Capital Management, LP ("Brigade"), voiced its concerns about the Proposed Transaction in a Schedule 13D filed with the SEC on December 27, 2017. Brigade, which holds 5.8% of outstanding Kindred common stock, opposed the Proposed Transaction as being inadequate and "significantly undervalu[ing]" Kindred's common stock. Brigade believed that a sale of the Company was premature, as Kindred was poised to see "substantial stock price appreciation in 2018 and beyond."

37.     In a letter delivered to the Board on December 27, 2017, Brigade wrote:

As large and long-term shareholders of Kindred Healthcare, Inc. ("Kindred" or the "Company"), we were shocked at Kindred's announcement on December 19, 2017 that it had entered into a merger agreement, pursuant to which the Company will be acquired by affiliates of TPG Capital, Welsh, Carson, Anderson & Stowe, and Humana Inc. for the disappointing and grossly inadequate price of $9.00 per share. From the perspective of maximizing shareholder value, this is a terrible time to sell the Company. This acquisition appears timed to enable the buyers and members of management to (i) take advantage of the negative impact that certain recent (but temporary) events have had on the Company's stock price, and at the same time (ii) avoid paying full value for operational enhancements that are in process but not likely to be fully realized until next year. Over the past year, Kindred's earnings

---

[1] Williams, Sean, "Why Kindred Healthcare Shares Are Getting Crushed," The Motley Fool, November 5, 2015, available at: https://www.fool.com/investing/general/2015/11/05/why-kindred-healthcare-shares-are-getting-crushed.aspx.

[2] Orelli, Brian, "Why Kindred Healthcare, Inc. Jumped Higher Today," The Motley Fool, February 28, 2017, available at: https://www.fool.com/investing/2017/02/28/why-kindred-healthcare-inc-jumped-higher-today.aspx.

power has been negatively impacted by significant restructuring, disposition and transition activities which, per recent management commentary, will be largely complete in late 2017. One needs to look no further than management's discussion during Kindred's third quarter 2017 earnings call for proof of this point. Time and again during the call, management spoke of how the Company's underlying businesses faced various challenges in 2017, but have been restructured in a manner that should drive improved performance going forward. These statements are consistent with the FY18 financial guidance that management provided on that call as well. These near-term set-backs should position Kindred for stronger operating performance and substantial stock price appreciation going forward.

Given these circumstances, we would have expected the Company's fiduciaries to stay the course in order to enable shareholders to reap the benefits of these improvements that they patiently awaited from their continued ownership in Kindred. Instead, management and the Board of Directors have chosen to pursue a transaction that severely undervalues the Company and ensures that the buyers – rather than existing shareholders – will reap the benefits of the value enhancement the improved business will generate. For these reasons, Brigade Capital does not believe the proposed transaction is in the best interests of Kindred shareholders, and intends to vote against the transaction.

In Brigade's view, these short-term issues render highly misleading the purported 27% premium over the Company's 90-day volume weighted average price for the period ending December 15, 2017 that shareholders are supposed to receive under the proposed transaction. The transitory issues outlined above have created significant financial modeling complexity and have distorted the Company's true earnings potential. All of which has negatively impacted Kindred's stock price, undermining any significance of the premium to the unaffected pre-announcement stock price.

In particular, the following initiatives and other factors can reasonably be expected to increase both long-term growth and shareholder value:

- *Improved Regulatory Environment*. In July 2017, the Company's stock price fell by almost 15% because the Centers for Medicare & Medicaid Services ("CMS") unexpectedly proposed reimbursement methodology changes that could have negatively impacted Kindred's Home Health business segment. Four months later, however, CMS decided not to include these changes in the final rule, removing a major near-term potential threat.

- *Kindred has divested its low multiple Skilled Nursing assets*. Kindred has been actively divesting its skilled nursing facilities throughout the course of 2017. An unfavorable regulatory backdrop, high capital-intensity requirements and earnings volatility in the Skilled Nursing business have depressed this segment's attractiveness and we believe pressured Kindred's recent trading multiple. The bulk of these facilities were sold in

the second half of 2017 and now that they have transitioned to new owners, Kindred is in position to remove a significant amount of overhead expense and benefit from the more favorable earnings trajectory and cash flow characteristics of the remaining businesses. The Company also executed contracts to provide rehab services for a number of the transferred skilled nursing facilities, but the economic benefit of these and any additional new contracts is not fully reflected in Kindred's financials for the last twelve months.

· *The Company has strengthened its balance sheet since 3Q17*. In October 2017, Kindred restructured its insurance program in a manner that released $281 million of cash that was trapped in its captive insurance subsidiary, which the Company then used to pay down its revolver while still adding ~$100 million in cash to its balance sheet. These changes alone should be worth around $3.00 per share of value to the Company's stock price. Tellingly, the Company's stock jumped from $6.00 per share to $8.40 per share on the day the Company announced this restructuring, and the stock price remained in a range between $7.15 and $8.60 per share per share leading up to the announcement of the merger. Furthermore, and again consistent with management commentary, settling the working capital accounts related to the divested skilled nursing assets has had a temporary negative impact on cash flow generation on a trailing twelve month basis.

· *Natural disaster activity in 2017 distorts Kindred's trailing twelve month performance*. Kindred's Home Health and Hospital segments were impacted significantly by hurricanes in the third quarter of 2017. Management commentary suggests these disruptions were transitory and expects both segments to return to year-over-year growth in the fourth quarter and beyond.

· *Kindred is at an earnings and cash flow generation inflection point*. Management expects the fourth quarter of 2017 to be its strongest cash quarter of the year, and in 2018, it is projecting $515 million of core EBITDA and $175 million of core free cash flow.

· *Kindred's Hospital Division is poised for improved performance*. This segment's trailing twelve month performance has been negatively impacted by a reimbursement change that took effect in 2016. Kindred's hospital division is expected to return to favorable year-over-year growth comparisons starting in the fourth quarter of this year. This reimbursement change has limited the Company's growth and required significant portfolio and infrastructure restructuring. The majority of this repositioning

activity has been completed, which should drive positive earnings momentum going forward.

· *Significant go forward cash tax shield*. The Company anticipates a net operating loss balance of $550 to $600 million at the end of 2017. This should provide Kindred shareholders with significant value by limiting the Company's cash income tax for several years.

In light of the foregoing, the $9.00 per share valuation underlying the proposed transaction is fundamentally inconsistent with management's own statements regarding the Company's positive outlook, performance initiatives and earnings power going forward. In our view, the deal price is not reflective of Kindred's intrinsic value and will short-change existing shareholders. Kindred is positioned for significant stock price appreciation. The Company has ample liquidity, no near-term debt maturities, and is expected to generate around $175 million of core free cash flow in 2018. There is no urgency to sell the Company, and conducting a sale process utilizing Kindred's significantly distorted trailing twelve month performance seems particularly misguided.

We believe this position is widely held by investors and would note the significant amount of trading activity in Kindred stock since the transaction was officially announced above the proposed $9 share offer price.

The proposed merger does not come close to maximizing shareholder value, is not in the best interests of shareholders and should not be approved by Kindred's owners. Brigade is disappointed that Kindred's management and board have chosen to move forward with such a poor transaction.

We look forward to reviewing additional details supporting this transaction in the definitive proxy materials, including the economic incentives and ongoing participation being offered current management and Directors by the proposed future owners.

38.     Brigade reiterated its opposition to the Proposed Transaction in an amended Schedule 13D filed with the SEC on February 1, 2018. In the Schedule 13D, Brigade stated that it "continue[d] to believe that the timing of the proposed Merger is ill-timed, as it does not allow the Issuer's existing shareholders to benefit from the much improved go forward earnings power of the business despite their support throughout the Issuer's repositioning efforts."

39.     Brigade's concerns about the Proposed Transaction are underscored by the sales process as described in the Proxy. Kindred received a number of proposals that offered more than the Merger Consideration. On November 28, 2016, Kindred received an offer of $10.50 to $12.00

per share from Financial Party B, Financial Party E and Financial Party F. Strategic Party 1 offered to acquire Kindred for approximately $13.00 per share on March 14, 2017, and Humana Inc. offered $11.00 to $13.00 per share on May 23, 2017. Yet the Board agreed to sell the Company for $9.00 per share.

40.    Even the analyses of the Company's own financial advisors illustrate that the Merger Consideration may not be high enough. For example, Barclays's *Selected Precedent Transaction Analysis* implied a per share equity value as high as $15.20 (excluding certain adjustments), while the *Selected Comparable Company Analysis* implied a per share equity value as high as $19.42. Guggenheim's *Discounted Cash Flow Analyses* implied a per share equity value as high as $18.21, while the *Selected Precedent M&A Transactions Analysis* implied a per share equity value as high as $14.25.

**B. Kindred's Officers Stand to Receive Benefits Unavailable to the Class**

41.    The Proxy acknowledges that the Company's executive officers have interests in the merger that may differ from those of the stockholders and may create conflicts of interest.

42.    Stock options, restricted stock and performance share units that have been awarded to and are held by Kindred's executive officers and directors will vest and be converted into the right to receive either the Merger Consideration or another amount. The treatment of these equity awards, in addition to benefits provided to executive officers through change in control severance agreements, will create a windfall for Kindred's executive officers that is unavailable to the common stockholders. As demonstrated in the following chart, the executive officers of Kindred in total stand to receive over $42 million, if they are let go without "cause" or voluntarily leave for "good reason" after the Proposed Transaction closes:

| Name | Cash | Equity | Perquisites/ Benefits | Pension/ NQDC | Tax Reimbursement | Other | Total |
|---|---|---|---|---|---|---|---|
| Benjamin A. Breier | $13,402,201 | $5,739,840 | $75,900 | — | — | — | $19,217,941 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Kent H. Wallace | $5,685,526 | $1,049,994 | $52,100 | — | — | — | $6,787,620 |
| Stephen D. Farber | $5,230,143 | $1,589,994 | $74,400 | — | — | — | $6,894,537 |
| David A. Causby | $4,092,866 | $1,199,988 | $64,800 | — | — | — | $5,357,654 |
| Joseph L. Landenwich | $3,023,810 | $659,997 | $74,200 | — | — | — | $3,758,007 |

## C. The Preclusive Deal Protection Devices

43.     As part of the Merger Agreement, Defendants agreed to certain preclusive deal protection devices that ensure that no competing offers for the Company will emerge.

44.     By way of example, section 7.04(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting or encouraging the submission of a takeover proposal. Section 7.04(a) also demands that the Company cease and terminate all solicitations, discussions or negotiations with any party concerning a takeover proposal.

45.     Despite already locking up the Proposed Transaction by agreeing not to solicit alternative bids, the Board consented to additional provisions in the Merger Agreement that further guarantee the Company's only suitor will be the Consortium. For example, pursuant to section 7.04(c) of the Merger Agreement, the Company must notify Merger Sub of any offer, indication of interest, or request for information that could lead to a takeover proposal. Thereafter, should the Board determine that the unsolicited offer is superior, section 7.04(d) requires that the Board grant Parent and Merger Sub five (5) business days to negotiate the terms of the Merger Agreement so that the takeover proposal is no longer a superior proposal.  The Consortium is able to match the unsolicited offer because, pursuant to section 7.04(d) of the Merger Agreement, the Company must provide Merger Sub with the identity of the party making the proposal and the material terms of the superior proposal, eliminating any leverage that the Company has in receiving the unsolicited offer.

46.     In other words, the Merger Agreement gives the Consortium access to any rival bidder's information and the right to top any superior offer.  Accordingly, no rival bidder is likely

to emerge and act as a stalking horse for Kindred, because the Merger Agreement unfairly assures that any "auction" will favor the Consortium and allow it to piggy-back upon the due diligence of the foreclosed second bidder.

47.    In addition, pursuant to section 9.04(a) of the Merger Agreement, Kindred must pay TPG VII Management, LLC, Port-aux-Choix Private Investments Inc., WCAS Management Corporation and Humana Inc. a termination fee of $29 million and Parent's expenses up to $10 million if the Company decides to pursue another offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

48.    Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances. Likewise, these provisions also foreclose any likely alternate bidder from providing the needed market check of the Consortium's inadequate offer price.

**D.  The Materially Incomplete and Misleading Proxy**

49.    The Individual Defendants owe the stockholders a duty of candor. They must disclose all material information regarding the Proposed Transaction to Kindred stockholders so that they can make a fully informed decision whether to vote in favor of the Proposed Transaction.

50.    Defendants filed the Proxy with the SEC on February 5, 2018, to provide the Company's stockholders with all material information necessary for them to make an informed

decision on whether to vote their shares in favor of the Proposed Transaction, among other reasons. However, significant and material facts were not provided to Plaintiff and the Class. Without such information, Kindred shareholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

### *Materially Misleading Statements/Omissions Regarding the Management-Prepared Financial Forecasts*

51.     The Proxy discloses management-prepared financial projections for the Company which are materially misleading.  The Proxy indicates that in connection with the rendering of Barclays's fairness opinion, Barclays reviewed "financial and operating information with respect to the business, operations and prospects of Kindred . . . including financial projections of Kindred prepared by Kindred's management for the years 2017 through 2022." Barclays also reviewed net operating loss projections prepared by Kindred's management for the years 2017 through 2022. The Proxy indicates that in connection with its fairness opinion, Guggenheim reviewed "certain non-public business and financial information regarding Kindred's business and prospects," which included financial projections for 2017 through 2022, "certain illustrative adjustments" to the projections to show the potential impact of changes to the U.S federal tax code, and "certain further illustrative adjustments" to the  projections to show the "potential negative impact on Medicare reimbursement" from changes to the U.S. federal tax code. Accordingly, the Proxy should have, but failed to, provide certain information in the projections that Kindred's management provided to the Board, Barclays and Guggenheim.

52.     Notably, Defendants failed to disclose: (i) revenue by segment (Home Health Services, Hospice Services, Hospitals, Kindred Hospital Rehabilitation Services and RehabCare); (ii) salaries, wages and benefits; (iii) supplies; (iv) stock-based compensation expense; (v) rent by segment (Home Health Services, Hospice Services, Hospitals, Kindred Hospital Rehabilitation

Services and RehabCare); (vi) other operating expenses; (vii) G&A expenses; (viii) litigation contingency expense; (ix) restructuring charges; (x) depreciation and amortization by segment (Home Health Services, Hospice Services, Hospitals, Kindred Hospital Rehabilitation Services and RehabCare); (xi) EBIT; (xii) income/loss from continuing operations by segment (Home Health Services, Hospice Services, Hospitals, Kindred Hospital Rehabilitation Services and RehabCare);(xiii) interest expense; (xiv) tax rate; (xv) net income; (xvi) capital expenditures by segment (Home Health Services, Hospice Services, Hospitals, Kindred Hospital Rehabilitation Services and RehabCare); (xvii) changes in net working capital; (xviii) noncontrolling interest distributions; (xix) any other adjustments to calculated unlevered free cash flow used by the advisors, including but not limited to "certain other projected net cash outflows" used by Barclays; and (xx) unlevered free cash flow, as used by both Barclays and Guggenheim in their respective DCF analyses. This omitted information is necessary for Kindred stockholders to make an informed decision on whether to vote in favor of the Proposed Transaction.

### *Materially Incomplete and Misleading Disclosures Concerning Barclays's Financial Analyses*

53.    First, with respect to the *Discounted Cash Flow Analysis,* the Proxy fails to disclose the specific value attributed to the present value of Kindred's net operating loss carryforwards. The Proxy also fails to disclose the specific amounts of net debt and book value of preferred stock used by Barclays, as well as the individual inputs and assumptions that Barclays used for the selection of discount rates of 8.50% to 9.50%. In addition, the Proxy fails to disclose the implied terminal EBITDA multiples that result from this analysis. Finally, the Proxy fails to disclose how, if at all, Barclays adjusted the analysis for hurricane impacts from Hurricane Harvey and Hurricane Irma.

54.    Second, with respect to the *Selected Precedent Transactions Analysis*, the Proxy

fails to disclose the weightings of profitability from each business line used by Barclays to determine the blended EV to LTM EBITDA multiple range used in the analysis. In addition, the Proxy fails to disclose the actual LTM EBITDA metric used by Barlcays, as well as the specific amounts of the adjustments used in calculating that LTM EBITDA metric relating to hurricane impacts, reductions in corporate overhead, the SNF divestiture and the closure of certain LTAC hospitals per Kindred management, both excluding and including further adjustments relating to projected future changes by CMS, per Kindred management, to the payment models under CMS for home health care and long-term acute care.  The Proxy also fails to disclose the specific amounts of net debt and book value of preferred stock used by Barclays. And the Proxy fails to disclose whether Barclays performed any type of benchmarking analysis for Kindred in relation the selected transactions.

55.    With respect to the *Selected Comparable Companies Analysis,* the Proxy fails to disclose the 2018 EV to EBITDA multiples for each of the selected companies. The Proxy also fails to disclose whether Barclays performed any type of benchmarking analysis for Kindred in relation to the selected companies. In addition, Proxy fails to disclose the specific value attributed by Barclays to the present value of Kindred's net operating loss carryforwards, as well as the weightings of profitability from each business line used by Barclays to determine the blended EV to LTM EBITDA multiple range used in this analysis. The Proxy also fails to disclose the specific amounts of the adjustments used in calculating Kindred's EBITDA metric relating to hurricane impacts, reductions in corporate overhead, insurance restructuring-related cash, the SNF divestiture and the closure of certain LTAC hospitals. Finally, the Proxy fails to disclose the specific amounts of net debt and book value of preferred stock used by Barclays.

56.    With respect to the *Illustrative Potential Separation Costs*, the Proxy fails to

disclose the estimated fees and expenses related to issuing new debt financing, as well as the tax rate used by Barclays in their analysis.

57.     Finally, with respect to the *Illustrative Future Share Price Analysis*, the Proxy fails to disclose the specific value attributed by Barclays to the present value of Kindred's net operating loss carryforwards for each of the years in this analysis. The Proxy also fails to disclose the projected amounts of net debt and book value of noncontrolling interest for each of the years of the analysis, as well as the number of fully diluted shares used by Barclays for each year of the analysis. Finally, the Proxy fails to disclose the specific inputs utilized by Barclays in their Capital Asset Pricing Model to determine the 10.0% cost of equity used in this analysis.

### Materially Incomplete and Misleading Disclosures Concerning Guggenheim's Financial Analyses

58.     First, with respect to the *Discounted Cash Flow Analysis,* the Proxy fails to disclose the specific definition of after-tax unlevered free cash flow used for this analysis. The Proxy also fails to disclose the individual inputs and assumptions used to derive the discount rate range of 8.00% to 9.25%. In addition, the Proxy fails to disclose the implied terminal EBITDA multiple range that results from this analysis, as well as how, if at all, Guggenheim accounted for the value of Kindred's net operating loss carryforwards. The Proxy also fails to disclose the specific terminal year normalized after-tax unlevered free cash flow metric to which the selected perpetuity growth rates were applied. Finally, the Proxy fails to disclose how, if at all, Guggenheim adjusted the analysis for hurricane impacts from Hurricane Harvey and Hurricane Irma.

59.     Second, with respect to the *Selected Precedent Merger and Acquisition Transactions Analysis*, the Proxy fails to disclose the specific EBITDA metric for Kindred to which the selected LTM EBITDA multiples were applied. The Proxy also fails to disclose the specific criteria used by Guggenheim to determine which of the selected transactions were "most

relevant." And the Proxy fails to disclose how, if at all, Guggenheim incorporated the value of Kindred's net operating loss carryforwards in the analysis.

60.     With respect to the *Selected Publicly Traded Companies Analysis,* the Proxy fails to disclose the specific criteria used by Guggenheim to determine which of the selected companies were "most relevant." The Proxy also fails to disclose how, if at all, Guggenheim incorporated the value of Kindred's net operating loss carryforwards in the analysis. Finally, the Proxy fails to disclose the specific metrics of NTM EBITDA and NTM EBITDAR to which the selected ranges of multiples were applied.

61.     Finally, with respect to the *Illustrative Discounted Cash Flow Analyses (Tax Bill Cases)*, the Proxy fails to disclose the individual inputs and assumptions utilized by Guggenheim to derive the discount rate range of 8.25% to 9.50%. The Proxy also fails to disclose the specific terminal year normalized after-tax unlevered free cash flow metric to which the selected perpetuity growth rates were applied, as well as the range of implied terminal EBITDA multiples resulting from this analysis. In addition, the Proxy fails to disclose how, if at all, Guggenheim incorporated the value of Kindred's net operating loss carryforwards. The Proxy also fails to discuss the tax rate utilized by Guggenheim in the analysis, as well as how, if at all, Guggenheim adjusted its analysis for hurricane impacts from Hurricane Harvey and Hurricane Irma.

### *Materially Incomplete and Misleading Disclosures Concerning the Flawed Process*

62.     The Proxy also fails to disclose material information concerning the sales process. For example, the Proxy fails to state whether the confidentiality agreements Kindred entered into with 13 parties (other than the Consortium) are still in effect. In addition, the Proxy does not disclose the basis for only Financial Party K, Humana, Strategic Party 1, TPG, and Financial Party L having standstill provisions that allowed those parties to submit confidential proposals to the

Board if Kindred announced plans to enter into a change of control transaction, and whether the confidentiality agreements with the other 10 parties contain don't-ask-don't-waive standstill provisions that are presently precluding them from making a topping bid for the Company.

63.     The disclosure of the terms of any standstill provisions is crucial to Kindred stockholders being fully informed of whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company. This information is especially important where, as here, the Proxy is silent as to whether any confidentiality agreements contained a don't-ask-don't-waive provision and whether any such provisions have been waived.

64.     The fairness opinion provided by Barclays notes that Barclays was "co-manager on an $800 million senior notes offering by Humana in December 2017." But the Proxy does not disclose how Humana planned on using the proceeds of the offering, which is necessary—given that Humana is paying $800 million for its ownership share in Kindred's at-home health business—to determine whether a conflict of interest exists. Barclays' fairness opinion notes that Barclays received $34 million in fees from WCAS and TPG, yet the Proxy does not disclose whether this was considered by the Board before it decided to retain Barclays as a financial advisor.

65.     While the Proxy notes that a version of Kindred's financial model was intended to be provided to bidders in the weeks after January 20, 2017, the Proxy does not disclose which parties received the financial model, whether any party received updated projections and, if so, when and to which party such projections were provided.

66.     In addition, the Proxy fails to disclose the specific potential alternatives the Board and senior management discussed on July 14, 2016.

67.     The Proxy also fails to disclose the basis for the Board, senior management and Kindred's financial advisors noting that "shares of diversified healthcare companies often trade at

a discount relative to the sum of the intrinsic values of such companies' respective business lines" at meetings on December 13 and 14, 2016, August 2, 2017, and November 1 and 2, 2017. The Proxy further fails to disclose whether Barclays and/or Guggenheim performed any analyses to reach this conclusion.

68.    The Proxy fails to disclose the impact of Hurricane Harvey and Hurricane Irma on Kindred and the potential impact of the HHGM proposal as reviewed by members of Kindred senior management at the Board meeting on October 13, 2017.

69.    The Proxy also fails to disclose the preliminary financial analyses concerning Kindred that were reviewed with the Board or the Transaction Committee on December 13 and 14, 2016, February 16 and 17, 2017, May 24 and 25, 2017, August 2, 2017, October 3, 2017, October 13, 2017, November 1 and 2, 2017, and December 5, 2017.

70.    Finally, the Proxy fails to disclose the preliminary financial analyses of Strategic Party 1's proposal discussed with the Board on February 16 and 17, 2017, the preliminary financial analyses of Strategic Party 1's proposals discussed with the Transaction Committee on March 125, 2017, the preliminary financial analyses of Strategic Party 1's proposal discussed with the Board on March 23, 2017, the preliminary financial analyses of Strategic Party 1's March 14 Reverse Morris Trust proposal discussed with the Transaction Committee on April 17, 2017, the preliminary financial analyses regarding Humana's proposal discussed with the Board on May 24 and 25, 2017, and the preliminary financial analyses regarding a theoretical joint venture with Humana concerning the Kindred at Home business as discussed with the Transaction Committee on November 17, 2017.

71.    This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were

not fully informed as to the defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process. And without all material information, Kindred stockholders are unable to make a fully informed decision in connection with the Proposed Transaction and face irreparable harm, warranting the injunctive relief sought herein.

72.     In addition, the Individual Defendants knew or recklessly disregarded that the Proxy omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

73.     Specifically, the Individual Defendants undoubtedly reviewed the contents of the Proxy before it was filed with the SEC.  Indeed, as directors of the Company, they were required to do so.  The Individual Defendants thus knew or recklessly disregarded that the Proxy omits the material information referenced above and contains the incomplete and misleading information referenced above.

74.     Further, the Proxy indicates that on December 18, 2017, Barclays and Guggenheim reviewed with the Board their financial analyses of the Merger Consideration and delivered to the Board an oral opinion, which was confirmed by delivery of a written opinion of the same date, to the effect that the Merger Consideration was fair, from a financial point of view, to Kindred shareholders. Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning Barclays' and Guggenheim's financial analyses which has been omitted from the Proxy, and thus knew or should have known that such information has been omitted.

75.     Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's

shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9**

76.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

77.     Defendants have filed the Proxy with the SEC with the intention of soliciting Kindred shareholder support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above.

78.     In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Kindred, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

79.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

80.     Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) management's financial projections; (ii) the value of Kindred shares and the financial analyses performed by Barclays and Guggenheim in support

of their fairness opinions; and (iii) the sales process.

81.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Barclays and Guggenheim reviewed and discussed their financial analyses with the Board during various meetings including on December 18, 2017, and further states that the Board relied upon Barclays' and Guggenheim's financial analyses and fairness opinion in connection with approving the Proposed Transaction. The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

82.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

83.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

84.     The Individual Defendants acted as controlling persons of Kindred within the

meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Kindred and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

85.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

86.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy.

87.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

88.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

89.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representatives and his counsel as Class Counsel;

B.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from filing a Definitive Proxy with the SEC or otherwise disseminating a Definitive Proxy to Kindred shareholders unless and until Defendants agree to include the material information identified above in the Definitive Proxy;

C.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

D.     In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

E.     Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

G.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 9, 2018                              **BURKE NEAL PLLC**

                                                     s/ Jamie K. Neal
                                                     _____
                                                     JAMIE K. NEAL
                                                     2200 Dundee Road, Suite C
                                                     Louisville, Kentucky 40205
                                                     Tel: (502) 709-9992

**OF COUNSEL:**

**ROWLEY LAW PLLC**
Shane T. Rowley
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514